3090557, Urgencies US v. Henry. Counsel, please. Good morning, Justice. Justice always has to excuse himself. Oh, I'm sorry. He'll be able to hear what you're talking about. I'm deaf in my right ear. I've appeared before you before. I tend to get loud, and I apologize. I also need eye contact to know which one of you is speaking to me, because the voices are hard to pick up here. I'm sure you think that some of these judges can't hear either. So speaking loud is not a problem for us. Thank you. Your Honors, this is the ethylene oxide case, the EO case. It's sometimes referred to as ETO. It's an exposure case that resulted allegedly in a heart attack in the claimant. There are two basic questions that come with all of these EO cases, or all of these exposure cases. And the first question is, was there exposure? EO is in this plant. It's used as a sterilizing agent for surgical equipment. Of course there's exposure. It's the same kind of exposure as the exposure we have when we're wiping our kitchen table down with a Clorox sheet. You can smell it. There's an exposure to it. But what level is it dangerous? That's the question. And really, was the exposure sufficient to cause the heart attack which he had? The MSDS documentation shows us, and the testimony from Dr. Gay shows us, that there's a cascade of symptoms when you're exposed to this chemical. It starts with the simple burning of the eyes. It moves on to a whole list of things, from the topical exposure causes redness. You get chemical intoxication, which evidences itself by headache, weakness, dizziness, lack of coordination. You get airway inflammation caused by it. And then you get diarrhea, convulsions, some paralysis. And then, after 12 hours of excessive exposure, you get the pulmonary function distress that can lead to things like a heart attack. Your lungs fill with fluid. It stresses the heart. You have a massive heart attack. Counsel, let me ask you this. Did the employer contest the exposure, or did the employer contest the causal connection between the exposure and the heart attack, or both? They technically admitted to there is exposure to a chemical in the plant. And, in fact, the register showed he was exposed to 2.76 parts per million. There's actually some dispute about that in the evidence, isn't there? Yes, there is, because... I mean, for one thing, you agree, don't you, that the claimant was inside the chamber. That's correct. And any reading, and there's some disputes about where the... The register. The register was actually located, but regardless, that wouldn't have calculated what the exposure was inside the chamber anyway, right? No, it would not calculate inside the chamber. It would only show, the idea is that would be an indicator if there had been some kind of a spike. That's right. If it was leaking out of the chamber at that point, you would have a spike in the register located at that location. And you'd agree that exposure inside the chamber would be higher. It would have to be, obviously. Now, don't the ambulance records also have a notation, don't remember the exact language, but plant manager reports exposure at 2.76 parts per million? That's correct. They reported it at 2.76. All right. Okay. The readout showed 2.76. They were missing a decimal. The difference between 2.76 and 276 is this. MSDS documentation verifies you can have exposure of 5 parts per million without the use of a respirator. He was in chamber C with a respirator, which he claimed was dislodged. He inhaled EO, came out, felt chest pain, and said, I'm having a heart attack. I think he questioned what he was exposed to. Let me ask you another question. I mean, from the very beginning, didn't he come out and say, I've been exposed? Yes, he came out. The heart attack developed later. Yes, he did. In fact, he actually finished unloading the chamber by his testimony. That's right. It was disputed, isn't it, after the exposure? Well, there is a question on how that testimony can be read. Our version is he did empty the chamber because he signed off on the documentation showing he emptied the chamber. He said he never completed emptying the chamber and stepped out and felt the chest tightness and wanted to know what were the symptoms of EO. That was the question to his supervisor. What are the questions of EO? I just came out of the chamber. I've got this tightness in my chest. What are the symptoms? Here's the way this case develops, and we need an understanding of how the testimony came and how the theories of exposure changed. When we do a work out case, we hire our experts. We depose them. Then we take the testimony of the claimant and witnesses. At the time of Dr. Koh, the claimant's expert's testimony, he believed the exposure was 276 parts per million, not 2.76 as the registers disclosed. And he knew nothing about any malfunction in the rear venting system of chamber C. He knew nothing of it. He relied exclusively on the exposure numbers and said any exposure would have caused it. When I cross-examined him and said what if the numbers were as low as 2.76, below the OSHA requirement for a respirator, he said to me, I don't know what the OSHA requirements are because I didn't read the MSDS. He did not review it. He didn't know what it was, and he assumed it was one part per million. And, in fact, OSHA requires a respirator at five parts per million. So we depose him, and we expose our defense, which is you were never exposed to 276. It was 2.76. We go to trial, and now we have a new theory of the case, because in order to establish exposure, we have to establish a significant exposure. He's got none of the cascading symptoms of the scientific evidence says you get these cascading symptoms. He's got none of them. He jumps from zero to the worst possible condition in a matter of minutes. So what does he say? He tells us that the rear venting system malfunctioned. We've never heard this before. We get a continuance. It's on the record so that we can investigate this aspect of the case. Never heard this before. It's not contained in any record or anything else. And what we find when we do our investigation, and I know you guys read so many briefs. Part of my colloquialism is about referring to his guys, but gentlemen, you read so many briefs. I grew up on the South Side. I call it the silver bullet. I try to make it stand out to you. And the silver bullet is this. He signed off on the rear venting system functioning properly. We even had one of the switches admitted into evidence so you could see what it is. This is a clasp switch. When they shut the door, it shuts like this. When you open the door, it's supposed to spring open. Actually, it's like this. It's supposed to spring open because the door moves. If it doesn't spring open, they tap it. They do not enter the vault immediately. They don't go into chamber C immediately. They flip the steel, the things that cause it to be a complete suction in there. They flip them over so the door is ajar. They let it vent for three to five minutes so the rear venting system cleans the air. This is a heavily regulated chemical. Now it's clean. So what does he say? The venting system didn't work and I didn't know it. Well, our testimony shows that the venting system is so loud you have to shout to be heard when you're in the chamber. You can't miss it. And he testified contrary to what your employer's witnesses said about that. He did not rebut the statement that you had to shout to be heard. He did not rebut that. I thought he testified that it was that loud for the first 30 seconds or something like that and then it wasn't as loud. No, I don't recall it that way, Your Honor. I believe he said it. You can hear the venting around. These pallets are put in so tight there's virtually no room around it. And you can hear the whish of the air and the farther you get in it the louder it is because you're in the tunnel. You're in a closed chamber seat. He doesn't have the cascading effects. Now he testifies there's a problem with the rear venting system. I impeach him with his own signed document that there was nothing wrong with the rear venting system. There was nothing wrong with it. Then he testifies I never emptied the full chamber. He never rebutted in his own hand the signed document that there was no problem with the rear venting system. Is this fair? The company is not denying he was exposed but they're contesting the level of exposure. That's correct. Why don't we move to the causal connection? Okay, causal connection. That's the cascading effects of the chemical. MSDS shows you need about 12 hours worth of exposure to get to the point where he has respiratory failure to lead to a heart attack. Dr. Koh's position is we have respiratory failure. You've got the lungs filling with fluid which stresses the heart and causes the heart attack. Our doctor says it can't happen that way. You have to have a long duration of exposure and if you don't there has to be another reason. Earlier today you asked one of the gentlemen if it wasn't work related and what was it? This is related to this man's pre-existing heart disease. He had 90 to 95 percent occlusion. Counsel, is it accurate that Dr. Gay had never treated anybody for EO exposure? That's correct. He never did. As a matter of fact, Dr. Koh testified he'd treated a number of individuals for exposure, correct? Yes, he says he did up in Michigan or Minnesota. Gay's testimony was based on his reading the MSDS. I'm sorry. His expertise or his testimony was from the OSHA documents. Oh, yes. He relied on the OSHA documents and his research. We had his testimony to his research involving EO and his experiences with great health. So we have conflicting medical opinions. Why couldn't the commission follow Koh? Because you have to ignore the scientific evidence. The scientific evidence says you have to have a list of symptoms that cascade down. He was never exposed by his own testimony to 12 hours of EO. He was never there. So if you're never at that level, what about all the other things? He had no diarrhea. He had no convulsions. He had no inflammation of the throat. He had none of these symptoms. Was that based on the fact that it's a healthy person? What about the fact, you alluded to it, he had pre-existing heart problems, pre-existing heart conditions. So what about the argument that given the pre-existing conditions, exposure to the substance, even though it wasn't greater than what recommended, that in combination could have resulted in a heart attack? Neither expert testified that his pre-existing condition led to a fragile condition that would lead to a heart attack with minimal or minor exposure. No expert tested by the net. Koh believed that the exposure was 276, and that number alone justified the condition from which he was exposed. Koh, although he testified that he treated patients on it, didn't even have the MSDS documentation right. He doesn't even know about the details of a cascading effect of symptoms, although he asserted he's an expert on these things. None of the information he could provide us, when I cross-examined him, correlated with what MSDS documentation shows would be the cascading effect of an exposure to this. If I have one drink and collapse on the floor, the question is, did one drink of alcohol kill me? We all know the cascading effects of alcohol and alcohol intoxication to the point of it being able to kill you in the level you have to get at. This man walking down is exposed, just down the aisles is exposed to two parts per million. We know it's 2.37 or 2.76 at the time he's emptying it right outside this area. So we know he has exposure. The question is, is the exposure enough? Well, we have to look at the scientific evidence to see if this is the cause. All right, and you say the scientific evidence. I mean, to summarize, the Commission, it's a manifest way to be evidence-tested. You're saying there's no evidence to support the Commission's finding. Is that the gist of it? That's the gist of what I'm saying. You're saying there's no scientific evidence to be able to establish that he should have reacted the way he did. That's right. There's no scientific evidence whatsoever to support it. Let me just have a moment to glance through my notes. Didn't Gay even more or less admit on cross-examination that because of his blockage, that it's possible that that triggered the heart attack, that even a lower exposure? No. What Gay admitted to was that if he had prolonged exposure, and when I brought that out in redirect examination, I said, what level of exposure? He said consistent with the OSHA guidelines, he'd have to be exposed and still demonstrate the cascade. He never demonstrated. When he was asked the isolated question of just assume this, could it or might it, he said yes. But when I said does it require more, he said absolutely. It requires an extended exposure to bring this about. The lungs don't fill with fluid. Do not fill with fluid. That's the critical thing. It's not the heart attack. His theory is his lungs filled with fluid. His heart condition, pre-existing as it is, is not the cause of the issue here. The question is if it wasn't exposure, would his lungs have filled with fluid? Sure, if they filled with fluid, his pre-existing condition would have brought about the heart attack even faster. But that's not the way this occurred. He had the heart attack, which caused the lungs to fill with fluid. It was the other way around, because the exposure never caused the lungs to fill with fluid. He didn't have the duration of exposure necessary to get him there. Okay, but exposure can lead to pulmonary edema, am I correct? Yes, 12 hours. Your argument is that it's the length of time to create pulmonary edema. That's correct, the length of time. At five parts per million, 12 hours. Counsel, you'll have time on rebuttal. I'm sorry? You'll have time on rebuttal. Oh, I'm sorry. Time is up for now. I couldn't hear your voice. I apologize. Counsel, please. May I please commission David Harrison for Mr. Fitzpatrick? First thing I'd like to comment on is we've heard about a cascade of symptoms. That's Mr. Zmanski's phrase. There's nothing in the MSDS, there's nothing in any other testimony about a cascade of symptoms. They talk about a variety of symptoms that might come about through exposure to EO, but there's nothing about a cascade of symptoms. There's not a set pattern of things that happen until you get to the pulmonary edema. And, in fact, Dr. Koh said that can happen, the pulmonary edema can happen almost immediately. It can, and some of these symptoms can happen up to 12 hours later. What about his argument that Koh misinterpreted the level of the exposure, that his opinion is based on a flawed understanding? He also said that his opinion wasn't necessarily completely based on the 2.76 parts per million. It was based more on the history given to him as to the exposure and what he had noticed. Whether it was 2.76 parts per million or whether it wasn't is something else I'll address here in a few minutes. But, basically, that figure comes from Mr. Boggs. Mr. Boggs is somebody that we should not believe this plant manager and I'll tell you why. Was our finding, our decision relative to the finding of the commission, is it dependent upon us determining the level of exposure? Or is your argument more subtle than that? I'm going to take that as kind of a two-pronged thing. I think that the evidence shows that there was more exposure than 2.76 parts per million because Mr. Fitzpatrick testified that he smelled an ether-like smell. According to the testimony of the witnesses and according to the material safety data sheet, that would have to be at 450 to 500 parts per million. So there was evidence in the record to support that he had been exposed to something more than 2.76 parts per million. The other testimony. Would it be fair to say that Coe's opinion, is there something in the record that suggests Coe's opinion would not change regardless of the PPM level? That Dr. Coe testified that, yes, that his opinion would not change regardless of the PPM level. I'm not sure if he's phrased it exactly that way, but basically his, whether it was 2.76 per parts was the figure. He was basing it more on the petitioner's testimony as far as his reactions and what he had observed. Your case rests upon Coe's medical opinion of etiology, correct? In part. Okay. But then why would you be going down that road of arguing what it was or wasn't? I mean, what do you mean in part? Well, because Dr. Guy also testified that the petitioner's symptoms of the bronchial irritation could have been caused by exposure to E.O., that was his testimony, and that that bronchial irritation could have led to the stressor, which caused the heart attack. So there were two parts. We're looking at both medical experts. But now we're just talking a disagreement as to length of duration or length of exposure, not duration. Well, yeah, I suppose. Both. And we've heard from you. We've got 12 hours. We've got immediacy. Coe says, what, it's not always 12 hours? In fact, you said it could happen almost immediately. The material safety data sheet doesn't say that you have to be exposed. But that's your argument. I mean, that's what's being presented at the commission. True. So what do we believe, the etiology of Coe and the chain of events that lead to pulmonary edema, which then led to this heart attack? Opposite view is we have a preexisting cardiac condition with occlusion, 90 to 95%. Correct. And it's clear that that can lead to pulmonary edema, the heart condition. According to Dr. Guy, correct. Well, we're talking what the evidence in the record says. And so pick and choose. Is that it? Basically, the commission was faced with that and came to the conclusion that they would look at what Dr. Coe said versus what Dr. Guy said. Manifest weight. And they're entitled to do that.  And they're entitled to do that, obviously. Correct, Your Honor. And so there's something in this record that will support the commission's decision, and you're saying it's Coe and this etiology he's proposed. And also, I'm also saying that Dr. Guy says that the bronchial irritation could have been caused by exposure to EO, and that could have been the stressor which led to the heart attack. Well, that's a little icing on your cake. I'll take the icing, Your Honor. I'll take whatever I get. In this particular case, we did have, just to point out, we had a man who was 42 years old. He ran five miles a day. He was on a stationary bike three times a week. He weight lifted up to 265 pounds. He coached wrestling, high school wrestling students. He was in fairly good shape. He had 95 percent collusion. And he was still able to do all of that, Your Honor. Time bomb. I agree. But when he had that stressor of not being able to breathe because of his exposure to the EO, that was the stressor which led to the problem, and there we go. Any other questions? Thank you. Counsel Rebello, please. In your point that Dr. Coe is the thing they relied on, that's right. But his opinion is baseless and unsupported by any of the evidence. That's the problem with his opinion. When we weigh the evidence, it's not just because somebody says this guy is black, that makes him black, we have an opinion of it. It's got to be supported by extrinsic evidence that leads us to the conclusion that that is the correct opinion. This court must weigh that evidence. And there is no scientific evidence to support Dr. Coe's conclusions or the way he frames how this pathology developed. It can't follow this timeline. It's scientifically impossible it can't follow this timeline. What evidence isn't there in the record that it's scientifically impossible? Did somebody testify that it's scientifically impossible? Well, in the MSDS documentation, they don't take people, inject them with EO and see if we can kill them. What they do is they take animals, they test it, they see what the reaction is, and they arrive at conclusions. It is still a scientific analysis as to the cascading effects of these symptoms. Is that a healthy person or a person with preexisting problems such as the claimant? Well, Mike, I'm not privy to it, but I've got to believe it's a healthy person. I can't imagine they would take a deteriorated person and use that as the baseline. And run a test on them. So I think your assumption is correct. Yes. So what about the doctor? The employee doesn't have to prove that the exposure was the cause. He can sustain his burden by proving that it was a causative factor. You've got a guy who's got a weakened condition. He's exposed to the toxic substance. And why can't, in combination, that be sufficient to prove an injury? Because the very given effect, cause and effect, of what caused this heart attack to believe the claimant got it from the exposure is that he had pulmonary edema that filled his lungs, that stressed his heart, that caused the heart attack. And the scientific evidence establishes that he could not have developed the pulmonary edema to that extent with that short a duration. What scientific evidence establishes that? The MSDS documentation and the doctor's testimony that say you have to have this cascade of symptoms, this length of exposure, with this level of exposure. It's got to be above 5 parts per million. It's got to be over 12 hours. Now, they've never taken a person and said, well, what if we give them 276 parts per million and see how many weeks it takes? But they do know that it will cause the skin irritation, the throat inflammation, the convulsions and everything else, before it leads to the pulmonary edema. So scientifically, you can't get pulmonary edema first in that short a duration. Because of that, irrespective of his preexisting condition, we didn't cause his heart attack. He couldn't have had the pulmonary edema first. Scientifically impossible. Therefore, the fact that he had the heart attack only reverses the reasonable conclusion. That he had the heart attack, it caused the pulmonary edema. And the only problem is the commission didn't buy that argument. That's why we're here. Well, I don't think the way the oral argument went, I don't think they understood it. I'll withdraw that. I apologize to the court and to the commission. I will just say that argument was lost in a glaze. If you have any other questions, I'll be glad to respond. Thank you, counsel. Of course, we'll take the matter under advisory for discussion.